# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

NORMAN P. SANDERS,　　　　　　　　　　Case No. 1:13-cv-481
　　　Plaintiff,
　　　　　　　　　　　　　　　　　　　　Beckwith, J.
　　　　　　　　　　　　　　　　　　　　Litkovitz, M.J.

　　　vs.

COMMISSIONER OF　　　　　　　　　　　**REPORT AND**
SOCIAL SECURITY,　　　　　　　　　　　**RECOMMENDATION**
　　　Defendant.

　　　Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the final decision of the Commissioner of Social Security (Commissioner) denying

plaintiff's applications for disability insurance benefits (DIB) and supplemental security income

(SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 13) and the

Commissioner's response in opposition (Doc. 20).

## I. Procedural Background

　　　Plaintiff filed applications for DIB and SSI on September 25, 2009, alleging disability

since June 30, 2008, due to seizures and high blood pressure. (Tr. 215). Plaintiff's applications

were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was

granted a de novo hearing before administrative law judge (ALJ) Samuel A. Rodner. Plaintiff, a

medical expert, and a vocational expert (VE) appeared and testified at the ALJ hearing. On April

27, 2012, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's

request for review by the Appeals Council was denied, making the decision of the ALJ the final

administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that

2

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2013.

> 2. The [plaintiff] has not engaged in substantial gainful activity since June 30, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

> 3. The [plaintiff] has the following severe impairments: right temporal lobe epilepsy, adjustment disorder with anxiety and depressive features, and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

> 5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with the following limitations: he can occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. He can stand and/or walk for a total of about 6 hours in an 8-hour workday and he can sit for about 6 hours in an 8-hour workday. He can never climb ladders, ropes, or scaffolds. He must avoid even moderate exposure to hazards, such as machinery or heights. Mentally, the [plaintiff] retains the ability to perform simple tasks and would benefit from a static work environment without strict production quotas, pace, or standards.

> 6. The [plaintiff] is capable of performing past relevant work as a janitor and laborer. This work does not require the performance of work-related activities precluded by the [plaintiff's] residual functional capacity (20 CFR 404.1565 and 416.965).[1]

---

[1] In the alternative, the ALJ determined based on the VE's testimony that plaintiff would be able to perform a significant number of unskilled medium jobs in the national economy. (Tr. 19-20). The ALJ specifically found that plaintiff would be able to perform the requirements of the representative occupations of cleaner/janitor (800 jobs locally and 200,000 jobs nationally) and assembler (1,200 jobs locally and 125,000 jobs nationally).

7. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from June 30, 2008, through the date of [the ALJ's] decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 10-20).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46) (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

The medical findings and opinions of record have been adequately summarized in the plaintiff's statement of errors (Doc. 13 at 2-4) and in the ALJ's decision (Tr. 13-18) and will not be repeated here. Where applicable, the Court will identify the medical evidence relevant to its decision.

On appeal, plaintiff assigns the following errors: (1) the ALJ determined plaintiff did not meet the Listings without conducting a proper analysis, and the ALJ's conclusion is not supported by substantial evidence; and (2) the ALJ's finding that plaintiff's seizure impairment does not meet the Listings and that plaintiff retains the RFC to perform medium work is not supported by substantial evidence because the ALJ mischaracterized the medical evidence and improperly relied on flawed testimony provided by the medical expert, Dr. Woodrow Janese, M.D. (Doc. 13).

### 1. The ALJ erred at Step Three of the sequential evaluation process.

Plaintiff asserts that the ALJ erred at Step Three of the sequential evaluation process by finding that his seizure disorder does not meet or equal Listing 11.02 or 11.03 and that his intellectual disability does not meet or equal Listing 12.05(C). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Doc. 13 at 6-8). The Court will initially address plaintiff's argument as it relates to his intellectual disability.

### a. Listing 12.05

Plaintiff argues that the ALJ erred by finding that his borderline intellectual functioning does not meet or equal Listing 12.05(C) for intellectual disability. Listing 12.05 states in pertinent part:

> [I]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; . . . .

The ALJ found that the paragraph C criteria were not satisfied because plaintiff did not have a valid verbal, performance or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. (Tr. 12). The ALJ stated that plaintiff obtained a Full Scale IQ of 75 and does not appear to have significant deficits in adaptive functioning.[2]   (*Id.*).

Plaintiff contends that the ALJ erred by finding Listing 12.05(C) is not met because the record shows he demonstrated significant deficits in adaptive functioning before age 22. Plaintiff alleges that a "deficit in academics" is shown by: (1) his report to consultative examining psychologist Dr. Griffiths that he attended special education through the 9th grade[3] (Doc. 13 at 9, citing Tr. 223-26), and (2) documented problems in the record with reading; *i.e.*, plaintiff required the help of a coworker or friend to complete necessary paperwork in prior jobs,

---

[2] The ALJ appears to have overlooked the verbal IQ score of 68 reported by consultative examining psychologist Dr. Brian Griffiths, Psy.D. (Tr. 312). However, this is harmless error because substantial evidence supports the ALJ's finding that the other requirements of the Listing are not satisfied as explained in the Court's discussion of the evidence.

[3] Plaintiff's school records could not be obtained for inclusion in the administrative record. (*See* Tr. 223-26).

including the prior job where plaintiff acted as a supervisor. (*Id.*, citing Tr. 22, 309-15). Plaintiff further alleges that his reports to Dr. Griffiths that he spent five years in prison as a young adult and he has never been married "speak to Plaintiff's limitations in social functioning." (*Id.*, citing Tr. 309-310). Finally, plaintiff alleges that Dr. Griffiths' conclusions that plaintiff's short term memory fell at the lower end of the average range, his attention and concentration skills were not strong, and his abstract reasoning skills were not strong, as well as the IQ scores he recorded (68 in Verbal Comprehension, 79 in Perceptual Reasoning, and a Full Scale IQ of 75), support a finding that plaintiff's cognitive impairments meet Listing 12.05. (*Id.* at 9-10, citing Tr. 311-312).

Substantial evidence supports the ALJ's conclusion that plaintiff does not experience deficiencies in adaptive functioning which satisfy Listing 12.05(C). Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills. *West v. Com'r Soc. Sec. Admin.*, 240 F. App'x 692, 697 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). *See also Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) ("The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'") (citing Diagnostic and Statistical Manual of Mental Disorders 49 (4th ed. 2000)). Plaintiff has not directed the Court to any evidence that shows he experienced deficiencies in "adaptive functioning" and that any such deficiencies arose during the developmental period. Plaintiff generally reported to Dr. Griffiths during the consultative evaluation that he was a "special education student" (Tr. 309, 310, 313), but this general allegation, standing alone, is insufficient to establish that plaintiff

experienced deficits in social skills, communication, or daily living skills prior to age 22. Further, the portions of the transcript plaintiff's counsel has cited to demonstrate that he required assistance with completing paperwork in his prior jobs indicate only that plaintiff previously worked as a supervisor and say nothing about requiring assistance with any aspect of the job. (Tr. 223-26). Further, plaintiff reported to Dr. Griffiths that he had been steadily employed all of his life and had never been fired from a job. (Tr. 310). Plaintiff specifically stated he had last worked as a "lot technician supervisor" for nine years before being laid off. (*Id.*). This speaks to plaintiff's ability to interact with others on a daily basis. *See West*, 240 F. App'x at 698 (prior to the deterioration of the plaintiff's physical health, he held a long-term, full-time position with the City, demonstrating his ability to interact socially on a daily basis). Plaintiff also reported to Dr. Griffiths that he had friends whom he saw on occasion, he occasionally saw his siblings, he could attend to his own grooming and hygiene, he could do chores, and he could shop. (Tr. 312). These activities indicate that plaintiff does not suffer deficits in adaptive functioning. *See West*, 240 F. App'x at 698; *Hayes*, 357 F. App'x at 677 (no deficits in adaptive functioning where the plaintiff cared for herself and her husband, cooked meals, did laundry and shopped, managed her finances, and took public transportation).

The medical evidence of record also supports the ALJ's conclusion that plaintiff does not meet the Listing for intellectual disability. Consultative examining psychologist Dr. Griffiths found that plaintiff had only mild limitations in his ability to relate to others, including fellow workers and supervisors; mild limitations in his ability to understand, remember, and follow simple instructions; moderate limitations in his mental ability to maintain attention, concentration, persistence and pace; and mild limitations in his ability to withstand the stress and pressure associated with day-to-day work activity. (Tr. 314). The state agency reviewing

8

psychologist, Dr. Paul Tangeman, Ph.D., found only mild restriction of activities of daily living and in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of an extended duration. (Tr. 328). This medical evidence indicates that plaintiff did not exhibit deficiencies in adaptive functioning, and thus supports the ALJ's conclusion that West did not meet or equal Listing 12.05(C). *See West*, 240 F. App'x at 699 (medical evidence indicated that the plaintiff did not exhibit deficiencies in adaptive functioning and supported the ALJ's conclusion that the plaintiff did not meet or equal Listing 12.05(C) where examining psychologists did not diagnose the plaintiff with any form of mental retardation and found that the plaintiff appeared to be capable of understanding simple instructions; he was capable of maintaining concentration and attention necessary to complete basic tasks in a work environment; he would not have difficulty interacting effectively with co-workers and supervisors; and he would not experience significant difficulty dealing with a reasonable amount of work stress).

For these reasons, substantial evidence supports the ALJ's finding that plaintiff's mental impairment does not meet Listing 12.05(C) for intellectual disability. This finding by the ALJ should be upheld.

**b. Listings 11.02 and 11.03**

Plaintiff alleges that the ALJ failed to adequately articulate the basis for his finding that plaintiff's seizure disorder does not meet or equal Listing 11.02 or 11.03, which state as follows:

> 11.02 *Epilepsy - convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment.* With:
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

11.03 *Epilepsy - nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.* With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

The ALJ stated that no treating or examining physician had indicated that plaintiff has an impairment that equaled the criteria of any impairment in the Listings. (Tr. 11). The ALJ stated he had specifically considered Listings 11.02 and 11.03 pertaining to convulsive and nonconvulsive epilepsy. (*Id.*). The ALJ made the following finding in this regard:

> [T]here is no evidence of daytime episodes or nocturnal episodes manifesting residuals which interfere significantly with activity during the day, as required by Listing 11.02. There is no evidence of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment, as required by Listing 11.03. This finding is supported by the testimony of the medical expert.

(*Id.*).

Plaintiff alleges that the ALJ's finding was in error because the ALJ was, at a minimum, bound to include findings of fact as to how frequently plaintiff's seizures occurred, the length of time plaintiff had been experiencing seizures of that frequency, and whether plaintiff was compliant with his medications during that time period. Plaintiff asserts that instead of including such findings, the ALJ simply repeated the language of Listings 11.02 and 11.03 and summarily relied on the testimony of the ME to find that plaintiff's seizure disorder does not meet these criteria. (Doc. 13 at 7-8, citing Tr. 21-22). Plaintiff alleges that the ALJ failed to cite any specific evidence which supports his assertions; failed to address which portions of the Listings were not met or equaled; and erroneously relied on the opinion of the ME despite affording the ME's opinion only "some weight," in part because the ME found no basis for a seizure disorder. (Doc. 13 at 6-7, 7 n.4). Plaintiff contends that the ALJ's failure to address the specific elements

of Listings 11.02 and 11.03 constitutes error under *Risner v. Comm'r of Soc. Sec.*, No. 1:11-cv-036, 2012 WL 893882 (S.D. Ohio Mar. 15, 2012) (Spiegel, J.). (Doc. 13 at 6-7).

In *Risner*, the Court reversed and remanded for further proceedings a case where the ALJ failed to adequately explain the basis for his decision that the plaintiff did not meet or equal a Listing. *Risner*, 2012 WL 893882, at *5. The ALJ in *Risner* made a specific finding of fact that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listing impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526)." *Risner*, No. 1:11-cv-36 (Doc. 7-2, Tr. 16). The ALJ in *Risner* gave no explanation whatsoever for this finding and simply continued to the next step of the sequential evaluation process. Despite the presence of substantial evidence in the record that could arguably support the ALJ's Listing decision, the *Risner* Court determined that the ALJ in the first instance should "assess whether the evidence put forth shows that Plaintiff meets or equals a Listing." *Risner*, 2012 WL 893882, at *5. *See also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (finding the ALJ erred by failing to analyze the claimant's physical condition in relation to the Listed Impairments) (cited with approval in *Risner*). Because the ALJ in *Risner* failed "to complete a required step in the five-step analysis," the Court remanded the matter to enable the ALJ "to complete his task." *Risner*, 2012 WL 893882, at *5. Conversely, if the undersigned is able to reasonably discern the evidentiary basis for a decision by the ALJ which is less than clear, then the decision should be upheld. *See Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (reviewing court on judicial review "may not supply a reasoned basis for the agency's action that the agency itself has not given," but may "uphold a decision of less than ideal clarity if the agency's path may

11

reasonably be discerned.") (quoting, respectively, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947); and *Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

Here, as in *Risner*, the ALJ erred at Step Three of the sequential evaluation process by failing "to articulate his reasons for why Plaintiff failed to meet or equal" Listing 11.02 or 11.03. *Risner*, 2012 WL 893882, at *4. The ALJ simply repeated the language of the Listings and found that the testimony of the ME Dr. Janese, who opined that plaintiff's seizures did not meet or equal Listing 11.02 or 11.03, supported a finding that the requirements of the Listings were not met. (Tr. 11). The ALJ did not explain how Dr. Janese's specific testimony supported the ALJ's conclusion that plaintiff did not meet the Listings. Nor did the ALJ reference and discuss in his subsequent analysis testimony by Dr. Janese or other record evidence that supported this conclusion. To the contrary, in his subsequent analysis, the ALJ provided a circumspect assessment of Dr. Janese's testimony, stating that he was giving only "some weight" to Dr. Janese, who observed that plaintiff's "EEGs are typically normal except for delta waves" and "ultimately opined that there was no basis for a seizure disorder," and "greater weight" to plaintiff's treating neurologists, who opined that plaintiff suffered from right temporal epilepsy. (Tr. 17). The ALJ provided no further explanation for his decision to credit portions of the testimony of the ME, who rejected the diagnosis of the treating neurologists. (*Id.*). It is therefore impossible to discern from the ALJ's decision how the ME's testimony, which the ALJ rejected in large part, supports a finding that plaintiff's seizure disorder does not meet the Listing. While the ALJ was not required to "spell out the weight he gave to each factor in his step three analysis" (*see Bledsoe*, 165 F. App'x at 411), the ALJ was required to provide a reasoned conclusion for his finding that plaintiff did not meet the Listings. It was particularly important that the ALJ fulfill that duty here where the ALJ rejected testimony by the ME that

plaintiff did not suffer from the medical impairment in question, yet still relied on the ME's

testimony to find that such medical impairment did not meet or equal the Listings.  As the Court

noted in *Risner*:

> Requiring a reasoned and explained conclusion is not merely a formalistic
> requirement.  On the contrary, as noted by the Sixth Circuit, it is a necessary
> component for this Court to ascertain whether the ALJ's decision was supported
> by substantial evidence.

*Risner*, 2012 WL 893882, at *5.  It is not for the Court to supply a reasoned basis for the ALJ's

decision.  *See Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43; *Risner,* 2012 WL 893882, at *5.  To the

contrary:

> The ALJ should, in the first analysis, assess whether the evidence put forth shows
> that Plaintiff meets or equals a Listing.  Should he determine [he] does not, the
> ALJ must explain his decision with a discussion and analysis of the evidence.

*Risner,* 2012 WL 893882, at *5.

The basis for the ALJ's finding that plaintiff's seizure disorder did not meet or equal the

Listings is impossible to discern.  The finding is not supported by the medical evidence cited by

the ALJ or by the opinion of the ME who testified that there was no basis for a seizure disorder,

contrary to the ALJ's finding.  Plaintiff's first assignment of error should be upheld on this

ground.

## 2. The ALJ's RFC finding is not supported by substantial evidence.

Plaintiff alleges as his second assignment of error that the ALJ misunderstood and

mischaracterized the medical evidence pertaining to his seizures.  Plaintiff contends that the

ALJ's analysis of the Listings and conclusions about plaintiff's RFC are flawed as a result.  The

Court has addressed the ALJ's failure to conduct a proper Listings analysis in connection with

plaintiff's first assignment of error.  The Court will therefore limit its analysis of the second

assignment of error to plaintiff's claim that the RFC assessment is not supported by substantial evidence because the ALJ misconstrued the evidence pertaining to plaintiff's seizure disorder.

The ALJ found that plaintiff has the RFC to perform medium work with the following restrictions.

> [H]e can occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. He can stand and/or walk for a total of about 6 hours in an 8-hour workday and he can sit for about 6 hours in an 8-hour workday. He can never climb ladders, ropes, or scaffolds. He must avoid even moderate exposure to hazards, such as machinery or heights. Mentally, the [plaintiff] retains the ability to perform simple tasks and would benefit from a static work environment without strict production quotas, pace, or standards.

(Tr. 12-13). In reaching this determination, the ALJ credited the opinion of the state agency reviewing physician, Dr. Jerry McCloud, M.D., who issued an opinion in March of 2010 finding that plaintiff was capable of a restricted range of medium work. (Tr. 16-17, citing Tr. 335-42). The ALJ also relied in part on the testimony of the ME, Dr. Janese, which he gave "some weight." (Tr. 17). For the reasons explained below, these assessments do not provide substantial support for the ALJ's RFC finding.[4]

Under the Social Security regulations, "[s]tate agency medical and psychological consultants . . . are highly qualified physicians [and] psychologists . . . who are also experts in Social Security disability evaluation," and whose findings and opinions the ALJ "must consider . . . as opinion evidence." *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (quoting *Richardson v. Perales,* 402 U.S. 389, 402 (1971) (citing 20 C.F.R. § 404.1527(e)(2)(i)). In addition, medical expert testimony consistent with the evidence of record can constitute substantial evidence to support the Commissioner's decision. *Atterberry v. Sec'y of Health &*

---

[4] The ALJ also gave "great weight" to the treating neurologists' opinion that plaintiff suffers from right temporal lobe epilepsy (Tr. 17), but there is no functional assessment by a treating neurologist or other medical source in the record. Plaintiff's treating neurologist Dr. Ravinda Samaraweera, M.D., issued a letter opinion on September 13, 2011, that plaintiff is unable to work because of his "intractable epilepsy" (Tr. 489), which the ALJ gave "less weight" because, among other reasons, this was an opinion on an issue reserved to the Commissioner. (Tr. 17).

*Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989). Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "A non-examining physician's opinion may be accepted over that of an examining physician when the non-examining physician clearly states the reasons that his opinions differ from those of the examining physicians." *Lyons v. Social Security Admin.*, 19 F. App'x 294, 302 (6th Cir. 2001) (citing *Barker v. Shalala*, 40 F.3d 789, 794-95 (6th Cir. 1994) (ALJ was entitled to accept non-examining medical advisor's opinion as to the severity of the plaintiff's impairments where, to the extent the medical advisor's conclusions differed from those of the examining psychologist, the medical advisor explained his position by reference to the objective medical and psychological reports in the plaintiff's file, as well as the undisputed facts concerning the plaintiff's prior work and social history)).

Here, Dr. Janese did not give clear and logical testimony which provided substantial support for the ALJ's decision. Dr. Janese testified that plaintiff's seizures could possibly be "syncopal episodes," which Dr. Janese described as fainting spells, despite the diagnosis of right temporal lobe epilepsy made by plaintiff's neurologists. (Tr. 79). Dr. Janese also referred to the consistent reports in the record that plaintiff experiences an aura of smelling ammonia before a seizure, and he provided a long, irrelevant statement concerning how ammonia is not used as a

test methodology because it irritates the nose.[5] (Tr. 81). Dr. Janese testified that plaintiff's

EEGs had all been normal except for a "delta wave spread," which he explained usually occurs

when an individual is starting to go to sleep and is not a seizure problem. (Tr. 86, 90). Dr.

Janese disputed the finding of a simple partial seizure[6] made on May 23, 2011, when plaintiff

underwent video EEG monitoring (Tr. 451), explaining the finding captured on video EEG as

follows:

> That's a wave, Your Honor. You've got to go back to what they're calling a
> seizure, not a seizure. A seizure, by definition, it's an old term. It means that you
> are normal and all of a sudden, the devil seizes you. And you go into, you know,
> in the 1600 and 1700s, if you ever had a seizure, you were - - you were shunned,
> because that was the devil coming out periodically.

(Tr. 87). Although the EEG report stated that plaintiff had "ictal speech during the discharge"

(Tr. 452), and Dr. Janese defined "ictus" to mean an individual is "actually having a seizure," Dr.

Janese appears to have discounted this observation. (Tr. 88). When his attention was drawn to

the record and he was asked what "ictal speech" meant, Dr. Janese responded:

> That's an interpretation of something that he was doing. Now, it could be like a
> psycho motor seizure where you are suddenly saying something that doesn't make
> sense or you are speaking in tongues or you are - - I mean, the - - it's kind of
> unusual. It's very rare, but where you are doing something that is psychologically
> different, not - -

(Tr. 88). The ALJ then brought to Dr. Janese's attention a record dated September 24, 2011,

reporting that plaintiff had been brought to the hospital "postictal, confused" by the Cincinnati

---

[5] Dr. Janese stated: "Now, in [Exhibit] 1-F-2, they mentioned, and this is May of 2009. It says unknown - - unconscious event. Now, concerning smelling ammonia. Ammonia is not used to test odor distinction or olfactory sensation because ammonia irritants [sic] the mucosa - - the mucosa of your nose, and it's [sic] trigeminal. It's [INAUDIBLE] nerve, it's touch. So, most of the time when people are having psychomotor seizures, the proverbial smell is that of burning [hay], and that usually indicates medial temporal sclerosis, but - - and, again, that's historically. But, all medical students learn that you are not supposed to test the sense of smell with ammonia, because the ammonia vapors, combined with the water on the mucosal surface can cause an irritation, which is sisner [PHONETIC]. People that have no sense of smell whatsoever will detect ammonia, because it will hurt their nose. So, I just throw that in there." (Tr. 81).
[6] A simple partial seizure is a type of seizure which is "localized to one area on one side of the brain, but may spread from there. Consciousness is not lost during a simple partial seizure."
http://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/epilepsy/seizures/types/simple-partial-seizures.html.

Fire Department after witnesses observed him having a grand mal seizure in the front passenger seat of a car. (Tr. 476). Dr. Janese responded that plaintiff had several drug tests which were positive for "tetrahydrocabannoid" (marijuana), and that "[c]oncerning his confusion, you can get confused taking tetrahydrocabannoid."[7] (Tr. 89- 90). Dr. Janese also testified that individuals can get sedated taking benzodiazepine, which plaintiff had been prescribed.[8] (Tr. 90).

Dr. Janese testified he found "no basis" for the diagnosis of right temporal lobe epilepsy made by plaintiff's treating and examining neurologists, noting that plaintiff's MRI had not disclosed medial temporal sclerosis, which would be the objective finding for seizures. (Tr. 89). Dr. Janese further testified that he saw "no basis for a seizure problem" and that plaintiff could be having Syncopal spells or some type of cardiac arrhythmia. (Tr. 91). However, on cross-examination, Dr. Janese testified that it was not his opinion that the doctors who had diagnosed right temporal lobe epilepsy were wrong; instead, he believed that the "interpretation of epileptogenic foci . . . is what defines a seizure." (Tr. 93-94). Despite finding no basis for a seizure disorder, Dr. Janese stated that he would impose the standard seizure precautions and restrict plaintiff from moderate exposure to open fire, moving machinery, unprotected heights, scaffolds, etc. (Tr. 91-92). Dr. Janese was equivocal as to whether driving restrictions should be placed on plaintiff. (Tr. 92-93). Dr. Janese indicated that plaintiff "runs two to three miles a day, that's usually, probably 15 or 20 minutes," citing a record dated February 2011 (Tr. 353), but plaintiff denied that he ran at all and in fact that record states that plaintiff *walks* two to three miles daily. (Tr. 92).

---

[7] The ALJ questioned whether the medical charts were accurate regarding plaintiff's marijuana use, stating that each chart routinely noted that plaintiff's last marijuana use was three months prior, and the ALJ stated he would make a determination on this. (Tr. 90). There is no report of a positive drug test on the date of the reported grand mal seizure or the date of any other seizure. No treating or examining physician linked a reported seizure to drug use.

[8] Dr. Janese stated that Ativan, Valium and Xanax are all forms of benzodiazepine. (Tr. 90).

In his decision, the ALJ partially credited Dr. Janese's testimony, stating:

> Some weight is given to Dr. Janese, who testified at the hearing that the claimant's impairments do not meet or equal any of the Listings. Dr. Janese observed that the claimant's EEGs are typically normal except for delta waves. He ultimately opined that there was no basis for a seizure disorder. Some weight is given to Dr. Janese; however, greater weight is ultimately given to the claimant's treating neurologists who opined that the claimant had right temporal lobe epilepsy, as they have been able to examine the claimant and assess his condition over time.

(Tr. 17).

The ALJ could not reasonably rely on Dr. Janese's testimony to fashion an RFC finding. Dr. Janese's medical expert testimony is not consistent with the evidence of record or with the ALJ's own findings. Dr. Janese failed to acknowledge the abnormal EEG result from May 23, 2011, which yielded a finding of a simple partial seizure and resulted in a diagnosis of right temporal lobe epilepsy. (Tr. 90). When pressed to explain the finding of a simple partial seizure, Dr. Janese gave a nonsensical answer, explaining that the seizure was "a wave" and that a seizure in past centuries was believed to be the devil seizing an individual. (Tr. 87). Dr. Janese provided no coherent explanation of the significance of the ictal speech finding reported on that date. (Tr. 88). Dr. Janese determined there was "no basis" for the diagnosis of "right temporal lobe epilepsy" made by the neurologists at University Hospital, despite the abnormal findings they reported. (Tr. 93-94). At the same time, Dr. Janese inexplicably refused to concede that the doctors who made the diagnosis were wrong. (*Id.*).

In fact, the ALJ rejected Dr. Janese's unsupported finding that plaintiff does not suffer from a seizure disorder and credited the ultimate conclusion of right temporal lobe epilepsy made by the treating neurologists. (Tr. 17). Nonetheless, the ALJ gave "some weight" to Dr. Janese's testimony. However, other than referencing Dr. Janese's testimony that plaintiff's EEGs are typically normal except for delta waves, which failed to acknowledge the abnormal EEG

18

resulting in the epilepsy diagnosis, the ALJ did not indicate which portions of Dr. Janese's testimony he was crediting. Having rejected Dr. Janese's conclusion that plaintiff does not suffer from a seizure disorder, the ALJ could not reasonably rely on Dr. Janese's testimony to assess plaintiff's functional limitations resulting from a seizure impairment without providing an explanation for these seemingly irreconcilable findings.

Nor does the state agency reviewing physician, Dr. McCloud, provide substantial support for the ALJ's RFC assessment. Dr. McCloud issued his opinion finding that plaintiff was capable of a restricted range of medium work in March of 2010. (Tr. 335-42). The ALJ adopted the opinion, finding that Dr. McCloud had noted no significant findings on examinations or diagnostic testing. (Tr. 17). However, Dr. McCloud's assessment pre-dates the abnormal EEG from May 2011 and the diagnosis of right temporal lobe epilepsy, which the ALJ failed to address when weighing Dr. McCloud's opinion. Dr. McCloud's opinion therefore was not based on a complete record and does not provide substantial evidence for the ALJ's opinion.

Further, it is impossible to discern from the ALJ's decision how the lack of significant findings on examination and diagnostic testing supports the RFC for a restricted range of medium work. The ALJ accepted the diagnosis of right temporal lobe epilepsy made by plaintiff's treating neurologists and found that plaintiff has a history of seizures. (Tr. 10, 13). The ALJ examined the records of plaintiff's emergency room visits for reported seizures on several dates and noted the positive EEG result from May 2011 (Tr. 278-83- 5/5/09; Tr. 295-9/23/09; Tr. 285- 10/10/09; Tr. 303- 12/30/09; Tr. 443- 1/16/11; Tr. 451- 5/11; Tr. 479- 9/24/11). (Tr. 13-15). The ALJ then concluded that the "neurological examinations as well as diagnostic testing, including MRIs of the claimant's brain, CT scans of the claimant's head, and EEG results have remained generally within normal limits, which suggests that the claimant's right

19

temporal lobe epilepsy is not debilitating." (Tr. 15). However, it is unclear from the medical

evidence cited by the ALJ whether there is a link between the general absence of positive test

results and the severity or frequency of plaintiff's seizures.[9] Absent a medical opinion which

provides this link, the ALJ erred by concluding based on the absence of positive neurological test

results that plaintiff's right temporal lobe epilepsy was not debilitating. *See Isaacs v. Comm'r of

Soc. Sec.*, No. 1:08-cv-828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) ("In making the

residual functional capacity finding, the ALJ may not interpret raw medical data in functional

terms.") (quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp.2d 908, 912 (N.D. Ohio 2008)).

*See also Underwood v. Colvin*, No. 1:12-cv-589, 2013 WL 3467199, at *7 (S.D. Ohio July 10,

2013) (Report and Recommendation), *adopted*, 2013 WL 3964917 (S.D. Ohio July 31, 2013);

*Mabra v. Comm'r of Soc. Sec.*, No. 2:11-cv-407, 2012 WL 3600127, at *3 (S.D. Ohio Aug. 21,

2012). *Accord Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however,

the ALJ was simply not qualified to interpret raw medical data in functional terms and no

medical opinion supported the [ALJ's RFC] determination.").

Finally, a review of the ALJ's decision and the medical evidence of record indicates that

the ALJ misconstrued pertinent portions of the medical evidence related to plaintiff's seizures

and the testing performed to detect seizure activity. The ALJ found that plaintiff's seizures were

not as severe as alleged because during a January 2011 hospitalization, plaintiff's medications

were tapered and plaintiff was taken off all of his anti-seizure medication by the second day of

the hospitalization. (Tr. 15, citing Tr. 446, 468). The record shows that the ALJ confused two

hospitalizations in citing this evidence and misunderstood the reasons the medicines were

stopped. The medical records show that after arriving at the emergency room "status

---

[9] The purpose of the tests, *i.e.*, whether they are intended to test the type, frequency, or severity of the seizures, is not apparent from the record.

epilepticus" in January 2011, plaintiff was "loaded" with medication and became "supertherapeutic" as a result. His medications were then held back one day until his levels dropped, at which point he was placed on a maintenance dose. (Tr. 446). Contrary to the ALJ's finding, there is no indication that plaintiff was taken off all of his medications during the January 2011 hospitalization. Rather, the second of the two records cited by the ALJ is from plaintiff's five-day May 2011 hospital admission for video EEG testing during which plaintiff's Dilantin was discontinued for test administration purposes and his Lamictal was tapered. The EEG documented a simple partial seizure which lasted approximately 4½ minutes, and plaintiff was discharged on Lamictal, Ativan, and Diastat as needed for seizing more than five minutes. (Tr. 467-68). At that time, plaintiff was discharged with seizure precautions, and it was noted that although the possibility of epilepsy surgery had been discussed with plaintiff, he had opted for medical management of his condition. (Tr. 468). Thus, the ALJ's citation to these records to show that plaintiff's condition was not as severe as alleged was in error and demonstrates a fundamental misunderstanding of the medical evidence.

In addition, the ALJ failed to address material evidence pertaining to plaintiff's seizures. The ALJ stated that "[f]or unclear reasons the claimant was admitted in critical condition" to the emergency room in January 2011. (Tr. 14, citing Tr. 444). However, the record includes an explanation of why plaintiff was admitted in critical condition at that time:

> CRITICAL CARE: Due to the immediate potential for life threatening deterioration due to status epilepticus with prolonged postictal period, [emergency room physician] personally spent 35 minutes performing critical care time on this patient. Time specifically excludes time spent performing procedures.

(Tr. 445). It is not clear from the ALJ's decision whether he overlooked this evidence or whether he did not consider it to be probative. Under either scenario, the ALJ's comment raises an issue as to whether he failed to take relevant evidence into account when assessing the

severity of plaintiff's seizure disorder. *See Morris v. Secretary of Health & Human Services*, No. 86-5875, 1988 WL 34109, at *2 (6th Cir. April 18, 1988) (It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence; otherwise, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.") (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

Finally, the ALJ unreasonably discounted the observations of one or more Emergency Medical Service (EMS) providers from the Cincinnati Fire Department, who reported that plaintiff vomited and seized for approximately 45 seconds while being transported to the hospital. (Tr. 434). The ALJ gave this report "reduced weight" because EMS personnel are "unacceptable treating sources and they provided no description of the alleged seizing[.]" (Tr. 14). It is true that emergency medical service providers are not acceptable treating sources whose *opinions* may be entitled to controlling weight under the regulations. *See* 20 C.F.R. §§ 404.1527, 416.927 (setting forth factors to be considered if a treating source's opinion is not given controlling weight)). However, in this instance the EMS personnel reported their *observations* of a medical event, not their opinion on the nature and severity of plaintiff's impairment. *See id*. The ALJ provided no valid reason to disbelieve the report of trained emergency medical personnel that plaintiff had vomited and seized en route to the hospital. The ALJ's decision to discount the observations of these medical personnel because they are not "treating sources" and they did not describe the seizure they reported is not supported by the record.

For these reasons, the ALJ's finding that plaintiff is capable of performing a restricted range of medium work is not supported by substantial evidence. In making this finding, the ALJ credited the opinion of the state agency reviewing physician, Dr. McCloud, which was based on

an incomplete record, and gave "some weight" to the medical expert, Dr. Janese, despite rejecting Dr. Janese's testimony that plaintiff does not suffer from a seizure disorder and without explaining which portion of Dr. Janese's testimony he was crediting.  The ALJ misconstrued pertinent medical evidence related to plaintiff's seizures and failed to adequately explain his findings.  Plaintiff's second assignment of error is well-taken and should be sustained.

## III.    This matter should be reversed and remanded.

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation.  All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date.  *Faucher v. Sec. of HHS*, 17 F.3d 171, 176 (6th Cir. 1994).  Reversal and remand are required for a proper analysis of plaintiff's seizure disorder, including a proper analysis of whether plaintiff's seizure disorder satisfies the Listings.  On remand, the ALJ should elicit additional medical expert and vocational expert testimony as warranted.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to 42 U.S.C. § 405(g).

Date: 7/10/14

Karen L. Litkovitz
United States Magistrate Judge

23

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

NORMAN P. SANDERS,       Case No. 1:13-cv-481
  Plaintiff,           Beckwith, J.
                Litkovitz, M.J.

  vs.


COMMISSIONER OF
SOCIAL SECURITY,
  Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).